JOHN A. NARD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nard v. Commissioner
Docket No. 25263-81.
United States Tax Court
T.C. Memo 1986-438; 1986 Tax Ct. Memo LEXIS 168; 52 T.C.M. (CCH) 476; T.C.M. (RIA) 86438; September 15, 1986. John W. Giltinan, for the petitioner. Russell F. Kurdys, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In a notice of deficiency mailed to petitioner on July 8, 1981, respondent determined a deficiency in petitioner's income tax for 1968 in the amount of $201,985.09 and an addition to tax under section 6653(b) *169 [1] in the amount of $119,727.87. In the statutory notice respondent asserted that the deficiency was caused by petitioner's failure to report on his 1968 return the following items of income: (1) $364,150.66 in materials and labor charged by petitioner to Armour and Company and used by him in the construction of a personal residence on certain lots located in Sewickley Heights Estates; (2) $20,000 in commissions received by petitioner for services rendered to the developer of Sewickley Heights Estates, the commissions being paid by the transfer during the year to petitioner of the lots on which the above residence was constructed; and (3) $16,000 in salary received by petitioner from Three Rivers Company. At trial, respondent conceded that the $16,000 in salary had been reported by petitioner on the 1968 return. On brief, respondent also waived any increased deficiency which is attributable to the omission from petitioner's return of a *170 finder's fee in the amount of $4,000 received from Louis Countouris. Respondent, however, did not waive the right to use this omission as part of his proof of fraud. With the above concessions, the issues remaining for decision are (1) whether petitioner realized income from the construction of the personal residence and the receipt of the lots upon which it is built; and (2) whether petitioner is liable under section 6653(b) for the addition to tax for fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation, supplemental stipulation, and exhibits attached thereto are incorporated herein by reference. Petitioner, John A. Nard, who also uses the name of J. A. Nard, resided in Sewickley, Pennsylvania, at the time his petition was filed. Petitioner was born in Norton, Virginia in 1928. He attended Virginia Military Institute for about a year and subsequently received in 1951 a degree in engineering from the University of Pittsburgh. He has been married to Kathleen O. Nard since 1952. They have five children. Petitioner also has a brother who is known as A. J. Nard. With money borrowed from his family, petitioner started the J. *171 A. Nard Oldsmobile Company in 1952. The company was not successful and failed completely in 1957 leaving petitioner indebted to his partner for approximately $15,000. This debt was repaid by petitioner in 1963 with funds received from the sale of a house. During 1957 and 1958 petitioner sold cars for McKean Oldsmobile Company and received Forms W-2 reflecting taxable wages in the respective amounts of $7,908.08 and $4,315.85. A subsequent investigation by respondent's agents revealed that petitioner did not file income tax returns for 1957 and 1958. However, the investigation also revealed that in those years he had overpayments in the respective amounts of $116.74 and $340.90. During the years 1959 through 1963 petitioner sold material handling equipment for Albert Curry Company and received Forms W-2 reflecting the following wages and withholding tax: Taxable Year
Wages
Withholding Tax
1959
$11,330.00
$1,441.80
1960
19,176.00
2,311.68
1961
14,692.00
1,776.00
1962
15.603.00
1,920.00
1963
9,615.25
1,273.90
Subsequent investigation by respondent's agents revealed that for these years petitioner did not file income tax returns, and *172 on March 1, 1966, the matter was referred to the Intelligence Division of the Internal Revenue Service by Revenue Agent John S. Warwick with the request that the case be investigated because respondent's records indicated that petitioner had not filed income tax returns for the years 1940 through 1964. In the Intelligence Division the matter was assigned to Special Agent John J. Kish whose investigation covered the years 1960 through 1963 and culminated in a report dated July 20, 1966 in which Special Agent Kish stated: The following is a computation at joint rates of the additional income tax due for the years 1960 through 1963: Less: W-2
Additional
Year
Total Tax
Withholding Tax
Tax Due
1960
$3,492.80
$2,311.68
$1,181.12 1961
2,223.92
1,776.00
447.92 1962
2,460.78
1,920.00
504.78 1963
899.90
1,273.90
(374.00)
CONCLUSIONS AND RECOMMENDATIONS
Although the investigation disclosed that Nard had failed to filed personal income tax returns for the years under investigation, it is concluded that this case does not possess the minimum standards necessary for criminal prosecution for the following reasons: 1. Additional *173 income tax is de minimis for the years 1960 to 1962, and in 1963 a refund is due the taxpayer. 2. Unreported income consisted solely of wages subject to withholding tax, no additional sources of income were disclosed. 3. There are no indications of any net worth increases. Based on the foregoing, it is recommended that the preliminary investigation be closed without further action by the Intelligence Division at this time. The matter was returned to the Audit Division of respondent's Pittsburgh office where it was ultimately determined that there were no deficiencies with respect to the years 1957, 1958, 1959, and 1964. It was also concluded that petitioner "probably had little or no taxable income prior to 1957" since his involvement in the Oldsmobile dealership resulted in bankruptcy. In September of 1963, petitioner left the Albert Curry Company and helped organize a Pennsylvania partnership known as the Three Rivers Company (Three Rivers) for the purpose of constructing and operating a cold storage warehouse at 295 West Steuben Street, Pittsburgh. The construction of the warehouse was completed in 1965. Until it was dissolved in 1974, the partnership interests in *174 Three Rivers were held as follows: Partner
Percentage
John A. Nard
35
R. Stewart Scott
35
Porter H. Scott
15
Walter A. Scott, Jr.
15
The Scotts are brothers who during the years under consideration owned and operated in a separate partnership a family real estate business known as Scott & McCune. For all practical purposes, petitioner and R. Stewart Scott (Stewart) were the only active partners in Three Rivers. Petitioner was in charge of its day to day construction activities, while Stewart took care of its financial arrangements. Petitioner did not receive a salary from Three Rivers during 1963 and 1964, but was advanced funds by the partnership for living expenses. Beginning in 1965 he received a salary. The Armour Project
In August of 1967, Three Rivers entered into a contact to design and build [2] a meat processing plant for Armour and Company near Three Rivers' cold storage facility on Steuben Street. The Armour contract, as negotiated by petitioner and Stewart, provided for a total contract price of $6,440,000, including an anticipated profit of $1,500,000 for Three Rivers. The contract required a retainage which was later fixed at *175 15 percent. Petitioner was responsible for the actual construction of the plant. At first he caused Three Rivers to act as its own general contractor and to employ separate subcontractors for each phase of the work. Subsequently, he arranged to have McCully-Smith, Inc., a general contracting firm, which was originally engaged to do only the concrete work on the plant, to supervise the work of some other subcontractors and to accumulate and submit their invoices to Three Rivers.As a result, part of the subcontractors submitted their invoices for materials and labor directly to Three Rivers and were paid accordingly. These subcontractors included Dodson Engineering, Penn Plumbing and Lendoll Corporation. Other subcontractors submitted their invoices through McCully-Smith and were paid by McCully-Smith. James E. McCully (McCully), petitioner's brother-in-law, owned 50 percent *176 of the stock in McCully-Smith and was the chairman of its board of directors. In October of 1967, he caused petitioner to be named a director of the company. Petitioner served without pay as a director until May of 1970 when he was removed by McCully because of the litigation which had developed between McCully-Smith and Three Rivers. Petitioner was never an officer or stockholder of McCully-Smith. Stewart was primarily responsible for the accounting and the financing of the Armour project. To do the accounting, he employed Clifford Collins (Collins) to work part time for Three Rivers. Collins was already working full time as general manager for Scott & McCune and he continued in this capacity. Scott & McCune's office, in which Collins worked, was located in the Frick Bullding. To account for the work being done, Stewart and Collins established a McBee Recordkeeping system. Under this system, Collins accumulated the invoices from the subcontractors, classified and posted them according to account number, determined the amount to be paid on each, prepared the necessary checks, took the checks to Pittsburgh National Bank (PNB) to obtain a draw to cover the checks, and then *177 issued the checks to the payees. Account numbers were established according to specific work categories such as steel, plumbing, grading, and the like. All of Three Rivers checks had to be signed by at least two partners. Most of the time they were signed by petitioner and Stewart. If Collins had any questions regarding which account number was to be used for an invoice, such questions were resolved by petitioner. In order to provide funds for the construction of the Armour plant, a disbursement procedure was agreed to by Three Rivers, Armour, and PNB. Under this procedure, Three Rivers would prepare an invoice on which the value of work performed to date was estimated. The invoice, signed by petitioner, was then submitted for approval to three Armour employees, the field engineer, the field accountant, and the project manager, D. E. Zaremba, all of whom were located at the site of the project. Upon approval of the invoice in the above manner, a progress payment certificate was issued to PNB by Zaremba for the amount of the invoice, less the agreed retainage. Upon receipt of the certificate, the net amount was released by PNB to Three Rivers and charged to Armour. Collins *178 was responsible for keeping a record for Three Rivers of the amounts certified to PNB by Armour as well as the amounts paid out by PNB pursuant to such certifications. Each month, McCully-Smith would mail or hand deliver its package of invoices to Three Rivers. The package usually consisted of a summary sheet with attached supporting data for each of McCully-Smith's subcontractors. At the beginning these packages were delivered to Three Rivers at the construction site on Steuben Street. Later the packages were delivered to Collins at the Frick Building which was located eight to ten miles from the construction site. When the packages were delivered to the construction site they were transported from there to the Frick Building by petitioner, usually on a daily basis. Upon receipt of a package of invoices Collins would break down each invoice and charge the items to specific accounts. In due course, Collins would eventually pay McCully-Smith who in turn would pay its subcontractors. As construction progressed, major changes occurred in the original plans. To compensate for each change an extra work order (E.W.A.) was issued. The extra work orders were considered additions *179 to the original contract. To account for such changes, McCully-Smith included its E.W.A.'s in the invoice packages delivered to Three Rivers. The Nard Residence
In October or November of 1967 petitioner started construction of a personal residence in Sewickley. The construction on the house continued until November of 1968. On December 4, 1967, petitioner employed Elso J. Baggio (Baggio), to supervise the construction of the residence for a total fee of $14,000 which was to be paid at the rate of $2,000 per month. Baggio was told by petitioner to submit all bills for labor and materials on the house to McCully-Smith. To account for the invoices being received on the house, Mr. McCully, at McCully-Smith, set up a separate E.W.A. to the Armour project. This account was titled E.W.A. 40 and all invoices charged to it were billed by McCully-Smith to Three Rivers as additional work on the Armour contract. During the construction of petitioner's residence Baggio independently hired some workers who had been or were concurrently working on the Armour project. In addition, petitioner hired some subcontactors for work on the house who had done work at the Armour plant. *180 All workers and subcontractors on the house were told by petitioner to bill either McCully-Smith or Three Rivers for work done on the house. Among the subcontractors who worked at one time or another on the house were Roofing, Inc., Dodson Engineering, Schmertz & Erwin, Lendoll Corporation, McCully-Smith, Penn Plumbing, Frank Dyson, Inc., W. T. Morton, R. C. Lame Associates, James Valiant Company, and Hornfield Engineering. At the end of 1967 and during the early part of 1968, Stewart was involved in remodeling and improving his residence. The work was quite extensive and included a deck and a swimming pool. McCully-Smith supervised the work, charged all invoices for material and labor to E.W.A. 40 and ultimately billed them to Three Rivers as extra work on the Armour contract. Although Three Rivers' records did not disclose that invoices for the work being done on the houses of petitioner and Stewart were being charged to the Armour contract, such invoices were identified and segregated on the records of McCully-Smith. Stewart Eventually paid or otherwise satisfied Three Rivers with respect to the work done on his house. As of the date of trial petitioner had not paid anyone *181 for any part of the labor and materials determined by respondent to have been used in his house. [3] When asked about payment during the construction in 1967 and 1968, petitioner repeatedly told McCully, Baggio, and several other subcontractors and workers that everyone would be paid when he collected his 35 percent of the profit in the Armour contract. At trial Stewart and both of his brothers admitted that prior to the end of 1968 they were aware that work on petitioner's house had been charged to Three Rivers and hence to Armour. During the summer of 1968 as construction on the Armour plant progressed toward completion, [4] relations between petitioner and the subcontractors as well as between petitioner and Armour began to deteriorate. Part of the difficulty stemmed from the fact that in September of 1968 petitioner was employed by Armour to take charge of the construction of a second plant in Sioux City, Iowa. With petitioner having two major construction projects separated by about 1,000 miles and the construction of a substantial house under way at the same time, the deterioration of the relations between petitioner and Armour accelerated. *182 On November 21, 1968 Armour terminated the contract with Three Rivers for the plant construction in Pittsburgh and ceased all payments to Three Rivers and its subcontractors. Immediately thereafter, Armour filed a suit in the United States District Court for the Western District of Pennsylvania against Three Rivers and its four partners for breach of contract. In the suit, Armour alleged that funds had been diverted from its plant project and used to construct petitioner's residence and to make improvements to Stewart's house. A countersuit was filed by Three Rivers and its partners alleging breach of contract by Armour. Over the next seven years, numerous suits and countersuits were filed by the parties as a result of the contract termination, but the original lawsuit was eventually tried, and on May 10, 1972, a judgment was entered by the District Court. [5] In the judgment, Three Rivers and its partners were ordered to make *183 restitution to Armour for the following items: $395,101
The amount received by Three Rivers
in excess of Payments to subcontractors
176,900
Payments made on E.W.A. 40 for Nard
29,000
Payments made on E.W.A. 40 for
Stewart Scott
36,000
Lendoll Corp. -- brick work on the
Nard residence
33,213
Penn Plumbing -- work on the
Nard residence
$670,214
To secure the payment of the amounts due as a result of work done on petitioner's house, the District Court impressed petitioner's property with a constructive trust in favor of Armour. Petitioner did not pay any part of the judgment in favor of Armour, but Three Rivers eventually paid the total amount of the restitution [6] and amended its 1968 partnership return to reflect the payment. Petitioner's allocations on the amended return which was filed in December of 1973 reflected withdrawals of $291,653.73 and an ordinary loss of $135,450.49. His capital account as *184 of the end of 1968 was determined to be a negative $454,791.76. Between 1968 and the date of trial, numerous judgments were entered against petitioner for labor and materials used in the construction of the house. These judgments included two in favor of McCully-Smith against petitioner and his wife for approximately $300,000. Petitioner's 1968 Return
At or about the time the Armour litigation was being initiated, Revenue Agent William Sepesy (Sepesy) undertook an audit of the 1966, 1967 and 1968 partnership returns of Three Rivers. He ascertained that the original 1968 partnership return had been prepared by James A. Gray (Gray), the certified public accountant who was then serving the partnership and who was also the representative of the Scott brothers. The return had been prepared in the spring of 1969 following a meeting between Gray, Nard, and the Scott brothers during which the construction of petitioner's house and the manner in which the construction costs were charged had been discussed. *185 In the preparation of the 1968 partnership return, Gray reported as income all amounts remitted to Three Rivers by Armour and deducted as expenses all checks issued by Three Rivers. During his audit of the partnership returns, Sepesy met with petitioner and Gray. At this meeting, petitioner admitted that he had not filed income tax returns for 1967 and 1968, but during the meeting he agreed to have Mr. Gray prepare such returns immediately. In the continuing audit of Three Rivers' returns, Sepesy proposed to disallow as deductions certain payments made by the partnership to petitioner in 1968. During the negotiations which followed, Gray proposed that instead of disallowing the payments as partnership deductions that Sepesy treat the items as income to petitioner. Gray's primary concern at this point was to protect the Scotts and to close out the partnership audit. Sepesy agreed with the proposal and Gray then met with petitioner in an attempt to persuade him to pick up the disputed items as additional income. Petitioner indicated that he would go along with the proposal. Between July and September of 1969, Gray prepared petitioner's 1968 return. In the preparation of the *186 return, Gray used partnership records, Sepesy's workpapers, and other figures provided by Sepesy. For the most part, petitioner's return was prepared from figures given to Gray by Sepesy. No part of the construction cost of petitioner's residence was included in the return. It was filed by petitioner as a married individual filing separately on the recommendation of Gray. During this same period, July through September of 1969, Sepesy was preparing a referral report to the Intelligence Division. The report, dated September 4, 1969, stated that as of that date income tax returns had not been filed by petitioner for 1967 and 1968. The report was approved by the Chief of the Audit Division on September 5, 1969, and on that day, Sepesy was advised by Gray that the returns were ready to be filed. Later on September 5, 1969, Gray met with Sepesy and filed petitioner's 1967 return [7] which reflected a tax liability of $2,582.51. He advised Sepesy that while the 1968 tax return had been prepared, it was not being filed at that time because petitioner was in the midst of the Armour litigation and did not have access at that time to all of his expense records. Nevertheless, Sepesy's *187 referral report was forwarded unchanged to the Intelligence Division and the case was assigned to Special Agent Joseph Lawlor. On November 19, 1969, Lawlor and Sepesy interviewed petitioner in the Special Agent's office. Petitioner was not represented. During the interview the agents repeatedly insisted that petitioner had not filed returns for both 1967 and 1968. Petitioner repeatedly stated that he thought Gray was handling the returns and that perhaps the 1968 return was not completed because his expenses could not be accurately calculated due to the pending lawsuit. The agents continued to insist that both the 1967 and 1968 returns had not been filed even though two months earlier Sepesy had personally accepted petitioner's 1967 return and knew that Gray had prepared the 1968 return using for the most part Sepesy's own figures. Petitioner's only explanation with respect to the 1967 return was that it must have *188 been lost by the Internal Revenue Service. During the meeting petitioner admitted that McCully-Smith billed the costs of his house to Three Rivers, but insisted that the house bills were never paid and that Gray was to charge him with income if and when the bills were paid. On December 15, 1969, petitioner's 1968 tax return was filed and the case was reassigned from Special Agent Lawlor to Special Agent William McMahon. During a meeting on October 18, 1971, petitioner told McMahon that before the end of 1968 he had talked with agent Jack Burke concerning the proper treatment of the house and that Burke suggested that petitioner keep a separate cost sheet on the house and pay taxes on the cost at the end of the year. At the conclusion of his investigation Special Agent McMahon recommended that petitioner be prosecuted under section 7203 for willfully failing to timely file income tax returns for 1967 and 1968. The Special Agent did not recommend prosecution under section 7201 for willfully attempting to evade and defeat the payment of income tax for 1968. On July 26, 1973, petitioner was indicted in the Western District of Pennsylvania under section 7203 for willfully failing *189 to file income tax returns for 1967 and 1968. He was also indicted at the same time for willfully attempting to evade and defeat payment of his income tax for 1968. In February of 1974, petitioner pleaded guilty to both counts of failing to file and pleaded nolo contendere as to the evasion count for 1968. Commissions
In 1968 petitioner received certain lots on which his residence was being constructed from the developer of Sewickley Heights Estates. The lots which had a fair market value in 1968 of $20,000 were transferred to him in exchange for an equal amount of services which he acquired for the developer from Penn Plumbing and Pennsylvania Light & Power Company and for which petitioner was still liable at the time of the trial. The lots were not reported as income on his 1968 return. Finder's Fee
In September 1968 petitioner received a finder's fee in the amount of $4,000 from Louis Countouris, an architect who performed professional services for Three Rivers. The fee was not reported on petitioner's 1968 return. In his notice of deficiency, respondent determined that in 1968, petitioner had failed to report income totaling $364,150.66 for material *190 and labor used in the construction of his house. The suppliers of such labor and materials and the amounts furnished by each was determined to be as follows: VENDOR
AMOUNT
Roofing, Inc.
$ 25,000.00
Dodson Engineering
3,138.89
Schmertz & Erwin A/C #91
2,300.00
Schmertz & Erwin A/C #203
2,500.00
Lendoll Corp. (Bricks)
38,179.24
McCully-Smith
254,943.22
Penn Plumbing
27,392.68
Frank Bryan, Inc.
5,000.00
W. P. Morton
206.70
R. C. Lame Associates
1,409.93
James Valiant Company
1,915.00
Hornfield Engineering
2,165.00
TOTAL
$364,150.66
Insofar as applicable here, respondent also determined that in 1968 petitioner had received and failed to report income in the form of lots having a fair market value of $20,000 from the developer of Sewickley Heights Estates and that petitioner was liable for the addition to tax provided by section 6653(b). Petitioner does not deny that meterials and labor in the amounts determined by respondent were used in 1968 in the construction of his residence. He contends, however, that such amounts do not constitute income because he intended to repay the same from his part of the profit under the Armour contract. *191 He further contends in effect that he has realized no economic benefit from such amounts because when he was unable to collect his part of the profit in the Armour contract he was unable to pay the amounts and is still indebted for them either to McCully-Smith, other subcontractors or to Three Rivers. Petitioner denies that he realized any income in 1968 upon receipt of the lots or the $4,000 from Louis Countouris. OPINION Section 61(a) provides that gross income includes all income from whatever source derived. It is well settled that the broad sweep of "gross income" as used in section 61(a) includes wrongful appropriations by a taxpayer where he "acquires earnings lawfully or unlawfully, without the consensual recognition, expressed or implied, of an obligation to repay." ; ; ; and , affd. . The factual situation before us differs from the factual situations involved in the above *192 cases but factually our case is almost identical to that considered in , affd. , cert. denied . In Benes, we pointed out the same factual differences and set forth the tests to be applied in this type of situation in the following manner: The Davis and Leaf cases involved factual situations where the stockholder had diverted (Davis) or withdrawn (Leaf) cash funds from the corporation which he controlled. Both cases rely strongly on , where the taxpayer who had extorted money from a victim, sought to avoid a conviction for tax evasion on the ground that he had no right or title to the extorted funds, but was under an obligation to return them to the payor-victim. Consequently, the defendant argued that the extorted funds were not taxable to him. The Supreme Court, sustaining the conviction, held that the extorted funds were taxable income, saying in part: An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over *193 it that, as a practical matter, he derives readily realizable economic value from it. * * * That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may have been assailable by someone with a better title to it. In the instant case, the economic gain asserted to be flowing to petitioner Elmer Benes is not in the form of cash or checks. Rather, petitioner's benefit is a series of improvements made to real property which belonged to his wife * * *. These benefits were conferred upon him by the expenditure of funds by his corporation over a series of years; and the Commissioner's determination is that the total amount of such expenditures made by the company in each of the * * * years here involved, is taxable income to said petitioner * * *. It seems to us that somewhat different criteria must be applied in determining (as we must in the instant case) whether a stockholder has derived economic benefit from the expenditures made in his behalf toward the erection of a residence, from those which are applied where he has *194 received cash from the corporation directly (as was true in the Davis and Leaf cases). The respondent suggests that the criteria properly to be applied in the instant case are: (1) Whether the petitioner * * * intended the * * * residence to be his residence from the very beginning; and (2) whether, while the residence was constructed * * * he had no intention to pay the corporation therefor, either as the residence construction passed through its varying stages toward completion, or upon ultimate completion. The petitioners appear to agree that these are the proper criteria. They seem reasonable to us; and we accordingly adopt them for use in the instant case. In our case there is no question but what petitioner intended the Sewickley house to be his personal residence; therefore we need only address the second criteria of Benes, i.e., whether during the construction of the residence petitioner intended to pay for it either during the course of construction or upon its ultimate completion. As a general rule, respondent's determination with respect to the residence would be presumptively correct and the burden would be upon petitioner to prove that the determination *195 was erroneous. ; Rule 142(a). However, in this case if the amount attributed by respondent to petitioner's residence is removed from respondent's computation, there is no deficiency for 1968. As a result respondent cannot, and does not, rely upon his usual presumption of correctness with respect to the deficiency because in order to sustain his burden of proof with respect to fraud, it is incumbent upon respondent to affirmatively establish with clear and convincing evidence that there is some deficiency in tax due from petitioner for 1968. ; ; ; ; and . Consequently, even though petitioner admits that all of the materials and labor set forth in respondent's notice of deficiency were used in the construction of his residence and were paid for at least in substantial part by Three Rivers and/or Armour, *196 respondent still has the burden of establishing that under the rule laid down in Benes, petitioner did not intend during the construction of the residence to repay Three Rivers and/or Armour for the cost of the construction. For the reasons set forth hereinafter, we find that respondent has failed to carry that burden. First and foremost, we are convinced that prior to the end of 1968 and long before his 1968 return was even due, let alone filed, the truth with respect to the manner in which petitioner's house was constructed and paid for was known by Mr. Baggio, Mr. McCully, and a number of other subcontractors, as well as by Armour, [8] the Scott brothers, their accountant, and at least some of respondent's agents. Secondly, with respect to petitioner's intention, during the construction in 1967 *197 and 1968 he made it clear time and time again to a number of subcontractors that the materials and labor going into the house would all be paid for when he received his part of the profit from the Armour contract. Moreover, in McCully's case petitioner made no attempt to hide the fact that the invoices charged to E.W.A. 40 were being billed to Armour. Thirdly, Gray, using for the most part figures furnished by respondent's agent, and other figures from the records of Three Rivers for which Gray was responsible, prepared petitioner's 1968 return and did not include therein any reference to the lawsuit which had been pending for over a year in which it was alleged by Armour that petitioner had diverted funds into his house. Fourthly, in view of the pending lawsuit which was a matter of public record and widely reported in the local press, little if any credence can be attributed to respondent's argument that petitioner not only failed to disclose the diversion of the funds into the house, but also made false statements and took other active steps to conceal such diversion. Finally, while petitioner's shoddy record with respect to the filing of income tax returns for prior years *198 might serve as a basis for an inference that the failure to file timely returns for 1967 and 1968 was willful, such record has no bearing upon petitioner's intention with regard to payment for the house. Furthermore, his record on past returns while admittedly unfavorable is not nearly as bad as respondent claims. Repeated statements at trial by respondent's counsel and agents, and by counsel on brief, to the effect that petitioner had not filed an income tax return since 1940 was not only misleading and totally unnecessary, but under the circumstances bordered on being an outright falsehood since petitioner was only 12 years old in 1940 and did not finish school until 1951. Moreover, respondent's own proof with respect to all of petitioner's adult years prior to 1968 (1952 through 1967) reveals that, after 15 years of off and on investigation by at least six different agents, respondent concluded that petitioner owed no income tax for 7 years, had overpaid his income tax by the end of 5 years, and owed relatively insignificant amounts for the remaining 4 years. The net findings in income tax by respondent's agents for these 16 years was $1,416.69, for an average of less than $100 *199 per year, computed as follows: Taxable
Tax Liability
Year
(Overpayment)
1952
1953
1954
1955
1956
1957
(116.74)
1958
(340.90)
1959
1960
1,181.12 1961
447.92 1962
504.78 1963
(374.00)
1964
1965
(763.00)
1966
(1,705.00)
1967
2,582.51 NET TAX DUE
$1,416.69 In view of all of the foregoing, we conclude that respondent has failed to establish that under the circumstances set out in our findings, petitioner did not intend during the construction of his house to repay Three Rivers and/or Armour for the amount of the materials and labor used therein. Instead, we are satisfied that it was petitioner's intention to repay the cost of such construction from his share of the anticipated profit from the Armour contract but was prevented from doing so by the termination of the contract by Armour and the subsequent litigation. Respondent, therefore, has failed to establish under Benes, that there is any deficiency in tax due from petitioner for 1968 and in the absence of a deficiency there is no basis for the imposition of the addition to tax for fraud under section 6653(b). Decision will be entered for petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, during the year in issue unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
2. As found by the District Court in subsequent litigation, Armour and Three Rivers contemplated that the plant would be designed and built simultaneously and the parties were aware that such procedure would require a substantial amount of "extra work" which was not included in the original agreement.↩
3. See pages 19-20, infra.↩
4. Ironically, the District Court found that in spite of the circumstances and haphazard fashion in which it was being done, the Armour project was 80 to 85 percent completed by November of 1968 and for the most part represented relatively good work.↩
5. See . The judgment was later affirmed by the Third Circuit. See .↩
6. After making the payment, Three Rivers and the Scott brothers attempted without success to obtain an assignment of the constructive trust on petitioner's house.↩
7. At the same time Gray also filed with Sepesy petitioner's 1964 return which reported zero tax liability. Petitioner had delinquently filed returns for 1965 and 1966 in the fall of 1968 on which refunds were due in the respective amounts of $763 and $1,705.↩
8. With respect to Armour, we, like the District Court, are at a loss to understand why the entire truth of the matter was not known as construction progressed, if in fact it was not known, by one or more of Armour's three employees including an accountant who were at the construction site and working with petitioner when the funds were being diverted into petitioner's house.↩